RENDERED: JANUARY 20, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0100-DGE

M.S.S.                                           APPELLANT

ON REVIEW FROM COURT OF APPEALS
NO. 2020-CA-0995
WARREN CIRCUIT COURT NO. 18-AD-00043

V.

J.E.B., D.J.B., AND K.K.F.S., A CHILD                  APPELLEES

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**<u>AFFIRMING</u>**

M.S.S. ("Mother") requested review of an opinion by the Court of Appeals affirming the Warren Family Court's order concerning the adoption of her minor child, K.K.F.S. ("Child"). Following a March 14, 2019, hearing, the Warren Family Court entered a judgment on May 21, 2020, terminating Mother's parental rights and granting to Appellees, J.E.B. and D.J.B., the adoption of Child without parental consent based on its finding that Mother abandoned Child for a period of not less than 90 days. The Court of Appeals affirmed that judgment, finding that clear and convincing evidence supported the family court's determination that Child was abandoned.

We granted discretionary review and directed the parties to address specifically whether the Cabinet for Health and Family Services ("the Cabinet")

was required to initiate an action to involuntarily terminate the biological parents' parental rights under Kentucky Revised Statutes (KRS) Chapter 625 before the filing of a petition for adoption by J.E.B. and D.J.B. After careful review, we hold that the Cabinet was not required to initiate an action for involuntary termination of parental rights before the filing of a petition for adoption and the family court did not err in granting the petition for nonconsensual adoption, thereby terminating Mother's parental rights. Consequently, we affirm the Court of Appeals.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mother is the biological mother of Child, who was born in January 2011. Mother has a long history of drug addiction and criminal convictions that have greatly interfered with her ability to be a part of Child's life.

Mother was first arrested for trafficking and first-degree possession of a controlled substance in 2009, before Child's birth. In October 2011, nine months after Child's birth, Mother was convicted of wanton endangerment and bail jumping. She was granted shock probation in 2012, but she was then convicted of possession of marijuana and sentenced to one and one-half years' imprisonment. In 2013, she was convicted of possession of methamphetamine and sentenced to another year of imprisonment. And in 2015, she was convicted of promoting contraband and sentenced to another two and one-half years' imprisonment. She was released in 2017 and has remained out of prison since then.

2

Before her incarceration in 2011, Mother voluntarily granted guardianship of Child to Child's maternal grandmother. However, in 2012, the maternal grandmother tested positive for various drugs, and the Cabinet filed a dependency, neglect, and abuse ("DNA") petition against her. As a result, Child was temporarily placed in the custody of J.E.B., a first cousin of Mother, and D.J.B., his wife, the Appellees in this case, in February 2013. The family court permitted Mother to visit Child at the discretion of the J.E.B. and D.J.B. Ultimately, J.E.B. and D.J.B. received permanent custody of Child on December 15, 2014.

On April 3, 2018, J.E.B. and D.J.B. filed a petition in the Warren Family Court to terminate Mother and the biological father's parental rights and to adopt Child without the consent of the biological parents under KRS 199.502(1). The family court set the petition for a final hearing on March 14, 2019.

At the hearing, Mother testified that she had not had any contact with Child since before November 24, 2014, the day her son was born, despite her remaining out of jail from November 2014 to December 2015. However, Mother testified that she attempted to visit Child multiple times during this period, but Appellees would not allow her to do so and would threaten to call the police if she came to their house. She also asserted that she was in the hospital with her other child, a son, for a period of time after his birth in November 2014 and was unable to visit Child during that period. She testified that, before November 2014, she attended visitation every time she could and, when

3

visitation was relocated to child's maternal aunt's house in early 2013, she brought clothes and other items for Child, but the maternal aunt would not give them to Child. Mother also asserted that, while in jail, she wrote letters to Appellees in which she asked about Child and enclosed drawings for Child. Mother testified that, after she was paroled in 2017, she contacted Appellees about visiting Child, but they denied her request. She filed a petition for visitation on February 1, 2018.

Mother also testified that she had made significant improvements in her life since her last incarceration began in November 2015. She has remained sober since that time, and, since her release in 2017, she has maintained steady, gainful employment and continued making child-support payments. She has also regained joint custody of her son and plans to buy a house soon. Because Child does not know Mother, Mother proposed a therapeutic reunification and has attended sessions with a licensed psychologist.

J.E.B. testified that, when he first gained temporary custody of Child in February of 2013, visitation took place at his house but was soon relocated to maternal aunt's house because Mother would arrive late or would not attend at all. He testified that, even after visitation was relocated, Mother frequently missed or arrived late to visitation. He estimated that Mother missed 70 to 80 percent of visitations during 2013 and 2014, and he stated that she often canceled last-minute.

J.E.B. acknowledged that on one occasion Mother brought clothes for Child to Appellees' house during visitation, but the clothes were too large, and

he did not give them to Child. He also testified that he could only remember Mother bringing a bag of candy to visitation at the aunt's house on one occasion. J.E.B. also acknowledged that Mother requested to have some contact with Child after November 2014 but only on holidays and Child's birthday. He also stated that he remembered receiving a couple of letters in the mail from Mother, but he did not give any of them to Child and eventually threw them away.

Child's maternal aunt also testified at the hearing and stated that she could only remember Mother showing up to visitation at her house on two occasions. She stated that Mother brought milkshakes for one of the visits and brought a bag of items for Child to play with at the other. The aunt stated that she could recall Mother calling twice to cancel visitation because of purported flat tires and once to cancel because she was in a fight with Child's maternal grandmother.

Shortly after the hearing, Child's guardian ad litem ("GAL") filed a supplemental report recommending that the court dismiss the petition for adoption and termination of parental rights.[1] In the GAL's opinion, although Mother was not present for significant periods of Child's life, her efforts to be involved with Child at various points were impeded by J.E.B. and D.J.B. She further opined that Mother had a reasonable expectation of improvement in her

---

[1] The GAL recommended dismissing the petition only with respect to Mother and expressly stated no objection to the family court terminating the parental rights of the biological father.

5

parental conduct considering the significant life improvements she has made since her 2017 release from prison.

The family court ultimately granted J.E.B. and D.J.B.'s petition, terminating Mother and the biological father's parental rights and granting the adoption of Child to J.E.B. and D.J.B.[2] Specifically, the court found that, under KRS 199.502(1)(a), Mother had abandoned Child for a period of not less than 90 days because, during periods of time when Mother was not in custody, she did not devote herself to parenting Child. Mother appealed the family court's judgment, but the Court of Appeals affirmed, concluding that clear and convincing evidence supported the family court's finding of abandonment. We granted discretionary review and now affirm the Court of Appeals.

## II. STANDARD OF REVIEW

"An adoption without the consent of a living biological parent is, in effect, a proceeding to terminate that parent's parental rights."[3] Parental rights are a "'fundamental liberty interest protected by the Fourteenth Amendment' of the United States Constitution."[4] As such, "termination of parental rights is a grave action which the courts must conduct with 'utmost caution.'"[5] So, "to pass

---

[2] Child's biological father did not appeal the family court's judgment.

[3] *B.L. v. J.S.*, 434 S.W.3d 61, 65 (Ky. App. 2014) (citing *Moore v. Asente*, 110 S.W.3d 336 (Ky. 2003)).

[4] *R.P. v. T.A.C.*, 469 S.W.3d 425, 426–27 (Ky. App. 2015) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).

[5] *Id.* (quoting *M.E.C. v. Commonwealth, Cabinet for Health & Fam. Servs.*, 254 S.W.3d 846, 850 (Ky. App. 2008)).

constitutional muster, the evidence supporting termination must be clear and convincing."[6]

That said, trial courts are afforded a "great deal of discretion" in determining whether termination of parental rights is appropriate.[7] "A family court's termination of parental rights will be reversed only if it was clearly erroneous and not based upon clear and convincing evidence."[8] "Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent minded people."[9] Under this standard, we are "obligated to give a great deal of deference to the family court's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them."[10]

Additionally, "[s]ince adoption is a statutory right which severs forever the parental relationship, Kentucky courts have required strict compliance with the procedures provided in order to protect the rights of the natural parents."[11]

---

[6] *Id.* (quoting *Santosky*, 455 U.S. at 769–70).

[7] *M.P.S. v. Commonwealth, Cabinet for Human Res.*, 979 S.W.2d 114, 116 (Ky. App. 1998).

[8] *M.A.C. v. E.A.*, No. 2020-CA-0087-ME, 2021 WL 2878347, at *2 (Ky. App. July 9, 2021) (citing *Commonwealth, Cabinet for Health & Fam. Servs. v. T.N.H.*, 302 S.W.3d 658, 663 (Ky. 2010); Kentucky Rule of Civil Procedure (CR) 52.01).

[9] *T.N.H.*, 302 S.W.3d at 663.

[10] *Id.* (citing *K.R.L. v. P.A.C.*, 210 S.W.3d 183, 187 (Ky. App. 2006)).

[11] *Day v. Day*, 937 S.W.2d 717, 719 (Ky. 1997).

## III. ANALYSIS

Mother argues that the family court erred in terminating her parental rights and granting the petition for adoption because the Cabinet did not initiate a proceeding to terminate her parental rights before J.E.B. and D.J.B. filed their petition for adoption. She further argues that the family court erred because its finding that she abandoned Child under KRS 199.502(1)(a) was not supported by clear and convincing evidence and conflicts with other factual findings in the judgment of adoption.

**A. The Cabinet for Health and Family Services was not required to initiate an involuntary termination of parental rights action before the J.E.B. and D.J.B. filed a petition for adoption without the consent of the biological parents.**

We address first the issue which we granted review to consider and which we specifically directed the parties to brief: whether the Cabinet was required to initiate an involuntary termination of parental rights action under KRS Chapter 625 before J.E.B. and D.J.B.'s filing of a petition for adoption.[12] We conclude that the Cabinet was not so required.

---

[12] Although not argued in the courts below, we directed the parties to brief this issue on our motion. Specifically, this Court's Order Granting Discretionary Review included the following directive:

> Among the issues to be specifically addressed regarding the involuntary termination of the parental rights of the biological parents herein, are whether the Appellees may initiate the involuntary termination of parental rights action, or whether the Cabinet for Health and Family Services must do so, pursuant to KRS Chapter 625, prior to the filing of a petition for adoption by the Appellees.

> Per our request, the parties dutifully argued both sides.

8

Appellees filed a petition seeking both involuntary termination of Child's biological parents' parental rights and the adoption of Child without the consent of the biological parents. Generally, involuntary termination proceedings are governed by KRS Chapter 625.[13] While proceedings for involuntary termination may be initiated by a number of different entities, including the Cabinet,[14] the Cabinet must always be made a party to the action.[15]

Adoptions, however, are governed by KRS Chapter 199.[16] That KRS chapter encompasses both adoptions with and without the consent of the biological parents.[17] While consensual adoptions, governed by KRS 199.500, require that "[t]he parental rights of the parents have been terminated under KRS Chapter 625[,]" no such requirement exists for adoptions without the consent of the biological parents, which are governed by KRS 199.502.[18] In fact, KRS 199.502 makes clear that, "[i]f granted, the adoption itself terminates

---

[13] *See* KRS 625.050.

[14] KRS 625.050(3) ("Proceedings for involuntary termination of parental rights may be initiated upon petition by the cabinet, any child-placing agency licensed by the cabinet, any county or Commonwealth's attorney or parent.").

[15] KRS 635.060 ("In addition to the child, the following shall be the parties in an action for involuntary termination of parental rights: . . . [t]he petitioner; . . . [t]he [C]abinet [for Health and Family Services], if not the petitioner; and . . . the biological parents, if known and if their rights have not been previously terminated.").

[16] *See* KRS 199.470.

[17] *See* KRS 199.500 (governing consensual adoptions); KRS 199.502 (governing adoptions without consent of the biological parents).

[18] Additionally, a family court may grant an adoption without the consent of the biological parents "if it is pleaded and proved as a part of the adoption proceedings that any of the provisions of KRS 625.090 exist with respect to the child." KRS 199.500(4).

the parental rights of the biological parents."[19] As such, a plain reading of KRS 199.500 and KRS 199.502 leaves no doubt that the Cabinet is not required to initiate an involuntary termination of parental rights action under KRS Chapter 625 before the filing of a petition for adoption without parental consent under KRS 199.502.

This statutory structure led the Court of Appeals to conclude correctly that when a petitioner seeking adoption files a dual petition seeking both involuntary termination of parental rights of the biological parents and an adoption without the consent of the biological parents, "the adoption supersedes the termination because KRS Chapter 199 encompasses Chapter 625."[20] In such cases, "KRS 199 governs the entirety of the . . . petition."[21]

While, in this case, J.E.B. and D.J.B.'s petition sought both adoption without consent of the biological parents and termination of the biological parents' parental rights, the petition specified that it was seeking adoption and termination only under KRS 199.502. The family court's judgment further makes clear that the adoption was granted under KRS 199.502, and only upon entry of the judgment of adoption were Child's biological parents' rights terminated, again under KRS 199.502. As such, the Cabinet was not required

---

[19] *C.J. v. M.S.*, 572 S.W.3d 492, 497 (Ky. App. 2019) (citation omitted); KRS 199.520(2) ("Upon granting an adoption, all legal relationship between the adopted child and the biological parents shall be terminated except the relationship of a biological parent who is the spouse of an adoptive parent.").

[20] *E.K. v. T.A.*, 572 S.W.3d 80, 83 (Ky. App. 2019) (citing *Wright v. Howard*, 711 S.W.2d 492, 495 (Ky. App. 1986)).

[21] *Id.*

to file an action to involuntarily terminate the parental rights of Child's biological parents under KRS Chapter 625 before the Appellees filed their petition to adopt Child. It was sufficient for the Appellees to proceed under KRS 199.502 alone.

Furthermore, the Cabinet is not necessarily required to be made a party to an action for the adoption of a child. KRS 199.470 provides that "any person who is eighteen . . . years of age and who is a resident of this state or who has resided in this state for twelve . . . months next before filing may file a petition for leave to adopt a child." And KRS 199.480, which lists all parties defendant required in an adoption, states that the Cabinet is only required to be a party defendant "if the care, custody, and control of the child has been transferred to the [C]abinet . . . ."[22]  Because this is an adoption case, and KRS 199 governs the entirety of the proceeding, the Cabinet was also not required to be joined as a party.[23]

Mother directs the Court to an unpublished opinion of the Court of Appeals, *K.N. v. R.P.*,[24] to support her argument that, notwithstanding the provisions of KRS Chapter 199, the requirements of KRS Chapter 625 should

---

[22] KRS 199.480(1)(d).

[23] The Cabinet is, however, required to place a child for adoption—if not done so by a child-placing institution or agency or with written approval of the secretary for health and family services—before a petition for adoption can be filed. KRS 199.470(4). And the Cabinet, "or any person, agency or institution designated by it or the court" is required to investigate and report in writing to the court whether the contents of the petition are true, whether the proposed adoptive parents are fit to care for the child, and whether the adoption is in the best interest of the child. KRS 199.510(1). The Cabinet fulfilled both requirements in this case.

[24] No. 2007-CA-000181-MR, 2008 WL 275106 (Ky. App. Feb. 1, 2008).

have been followed because, at its core, J.E.B. and D.J.B.'s petition sought to involuntarily terminate parental rights. But *K.N. v. R.P.* does not stand for the proposition that a proceeding to terminate parental rights initiated by the Cabinet must take place before a nonconsensual adoption proceeding.

Instead, in *K.N. v. R.P.,* great-grandparents filed a dual petition seeking to both terminate the parental rights of their minor great-grandchildren's biological parents and adopt the great-grandchildren.[25] However, the great-grandparents "sought a termination of the parents' rights *before* adopting the children."[26] The family court first held a trial on the termination proceedings, and, only after terminating parental rights and making the children available for adoption, considered and granted the great-grandparents' petition for adoption.[27]

The Court of Appeals reversed, finding that "[c]ontrary to the proceedings which the General Assembly allows under KRS 199.502 for adoption without parental consent, this case was not practiced under nor did it procedurally follow KRS 199.502."[28]  Rather, the court determined that the adoption proceedings were conducted under KRS 199.500(1)(b), which allows for adoption *only after* termination under KRS Chapter 625 occurs.[29]  And because the great-grandparents lacked standing to initiate the termination proceedings

---

[25] *Id.* at *1.

[26] *Id.* at *11.

[27] *Id.*

[28] *Id.*

[29] *Id.* (citing KRS 199.501(1)(b)).

under KRS 625.050(3), the family court erred in entering a judgment terminating parental rights.[30]

By contrast, termination and adoption were not treated as two separate causes of action in this case. Rather, the petition for adoption without parental consent was requested, heard, and granted in accordance with KRS 199.502, and Mother's parental rights were terminated as a result. As such, we find Mother's argument on this point unpersuasive.

Mother also emphasizes that the court in *K.N.* "made it clear that an individual whose parental rights are sought to be terminated is entitled to not only an enforcement of statutory requirements in the proceedings, but to constitutional due process protections that are afforded when the state plays a role." It is true that the court in *K.N.* noted that parental rights are accorded due process protection under the Fourteenth Amendment to the United States Constitution,[31] but that is beside the point. The proceedings in *K.N.* were flawed because the provisions of KRS Chapter 625 were not complied with, despite the family court entering a judgment of adoption under KRS 199.500(1)(b). The proceedings were not flawed because the Cabinet did not initiate a termination proceeding before the filing of a petition for *nonconsensual adoption under KRS 199.502*. In fact, the *K.N.* opinion suggests KRS 199.502 is the proper avenue for adoption proceedings initiated by a

---

[30] *Id.* at *12–13.

[31] *K.N.*, 2008 WL 75106, at *10.

private party that result in termination of parental rights.[32] As such, *K.N.* does not lead this Court to conclude the proceedings in this case were in any way constitutionally deficient. And, beyond referring this Court to the constitutional discussion in *K.N.*, Mother has not articulated a constitutional challenge to KRS 199.502 sufficient to warrant this Court's review.

Accordingly, the Cabinet was neither required to be a party to the adoption action nor required to file an action to involuntarily terminate the parental rights of Child's biological parents before the Appellees filed their petition to adopt Child under KRS 199.502.

The dissent finds KRS 199.502 unconstitutional on due process grounds. While we acknowledge that legitimate questions as to the constitutional sufficiency of the procedures set out in KRS 199.502 may exist, we do not believe those arguments are properly before us today.

The dissent identifies two perceived issues with the processes set out in KRS 199.502. First, the dissent asserts that KRS 199.502 presents a "constitutional end-run created by a statutory loophole" because it allows a party to seek an adoption without consent, which terminates the parental rights of the biological living parents, without having to prove all three of the requirements for terminating parental rights under KRS 625.050: "(1) the child is found or has been adjudged to be an abused or neglected child as defined in

---

[32] *See K.N.*, 2008 WL 75106, at *10 ("Contrary to the proceedings which the General Assembly allows under KRS 199.502 for adoption without parental consent, this case was not practiced under, nor did it procedurally follow, KRS 199.502.").

14

KRS 600.020(1); (2) termination of the parents' rights is in the child's best interests; and (3) at least one of the termination grounds enumerated in KRS 625.090(2)(a)-(j) exists."[33]  In essence, the dissent argues the findings necessary to grant an adoption, thereby terminating parental rights, when a party petitions the court under KRS 199.502 are less onerous than the findings the judge must make simply to terminate parental rights in an action brought by the Cabinet[34] under KRS Chapter 625.[35]  And second, the dissent states that KRS 199.502 is unconstitutional because, in effect, it permits private individuals to seek termination of parental rights by way of adoption.

However, the dissent fails to identify why the protections afforded to parents whose rights are sought to be terminated by way of an adoption without consent are constitutionally deficient, even assuming those protections are "significantly lower" than those afforded to parents subject to involuntary

---

[33] *Commonwealth, Cabinet for Health and Fam. Servs. v. K.H.*, 423 S.W.3d 204, 209 (Ky. 2014).

[34] As noted herein, KRS 625.050(3) permits "the cabinet, any child-placing agency licensed by the cabinet, any county or Commonwealth's attorney or parent" to bring a petition to involuntarily terminate parental rights.

[35] The dissent describes the protections afforded to non-consenting parents whose rights are sought to be terminated under KRS 199.502 as "significantly lower" than those afforded to parents whose rights are sought to be terminated under KRS Chapter 625. However, because the grounds set forth in KRS 625.090(2)(a)-(j) and KRS 199.502(1)(a)-(j) are substantially the same, and because in both termination and adoption the trial court must determine that such action is in the best interest of the child, KRS 199.520(1); KRS 625.090(c), we note that a party seeking termination under KRS Chapter 625 need only prove one more pertinent element than is required of a party seeking to adopt under KRS 199.502: the child is found or has been adjudged to be an abused or neglected child as defined in KRS 600.020(1). *See A.K.H. v. J.D.C.*, 619 S.W.3d 425, 427 (Ky. App. 2021) ('[O]ne of the fundamental differences between termination of parental rights cases and adoption without consent cases is the absence of an abuse or neglect requirement in the adoption without consent statute.").

termination under KRS 625.050.  Similarly, the dissent does not identify why the fact that a private party may petition the court for an adoption without consent, which if granted, simultaneously terminates the rights of the biological living parents, renders that process constitutionally deficient.  And, importantly, those arguments were never presented to this Court by either party.  As described above, Mother presented only a vague argument that the process for adoption without consent contained in KRS 199.502 somehow runs afoul of constitutional due process protections, relying on a somewhat irrelevant discussion of due process in *K.N.*[36] But that argument is neither specific nor clear.  This Court will not develop arguments on behalf of the parties, especially arguments challenging the constitutionality of a well-established statutory mechanism for adoption in the Commonwealth.[37]

### B. The family court's findings were supported by clear and convincing evidence.

Under KRS 199.502(1), "an adoption may be granted without the consent of the biological living parents of a child if it is pleaded and proved as part of the adoption proceeding that any of the following [nine] conditions exist with respect to the child[.]" Appellees' petition for adoption relied on the conditions in subsections (a), (e), and (g), which state:

(a) That the parent has abandoned the child for a period of not less than ninety (90) days;

. . .

---

[36] 2008 WL 275106, at *1.

[37] KRS 199.502 was enacted in 1994.

(e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child, and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child;

. . .

(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child[.][38]

The family court found Appellees had failed to meet their burden of proof with respect to subsections (e) and (g). Specifically, the court found that, "due to the significant changes and progress [Mother] has made," it was not persuaded by clear and convincing evidence that there is no reasonable expectation of significant improvement in Mother's parental conduct in the immediately foreseeable future or in parental care and protection, considering the age of the child.

However, the family court concluded that Mother had abandoned Child for a period of 90 days under subsection (a), and it granted the Appellees' petition on that basis. More specifically, the family court found that, "during periods of time when [Mother] was not in custody, she did not devote herself to parenting Child." The family court noted that, even though Mother was not incarcerated from November 2014 to November 2015, she had no contact with

---

[38] KRS 199.502(a),(g),(e).

17

Child, and instead engaged in activities that led to her re-incarceration. The court summarized Mother's efforts as "too little and too late."[39]

On appeal, Mother first argues that the family court's finding of abandonment under subsection (a) is inconsistent with its findings with respect to subsection (e) and (g). She contends that the family court could not have found both that it was not persuaded by clear and convincing evidence that that there is no reasonable expectation of significant improvement in Mother's future conduct and parental care *and* that she had abandoned Child for a period of not less than 90 days.

But we find this argument unpersuasive, as the family court's finding concerning Mother's reasonable expectation of improving her ability to parent in the future does not conflict with its finding of abandonment. Notably, subsections (e) and (g) require the court to consider a parent's future conduct and ability to parent, even despite any failure to provide parental care in the past. However, subsection (a) contains no requirement that the court consider the parent's future conduct and requires only a straightforward finding that the parent abandoned the Child for a period of 90 days or more.

Finally, Mother argues that the family court's finding of abandonment under subsection (a) is unsupported by clear and convincing evidence. Particularly, she notes that the family court failed to mention in its findings of fact and conclusions of law the GAL's supplemental report, which

---

[39] The Court did so by quoting *A.F. v. L.B.*, 572 S.W.3d 64, 74 (Ky. App. 2019).

recommended the court dismiss the petition with respect to Mother because Appellees thwarted Mother's attempts to contact Child and because Mother had a reasonable expectation of significant improvement based on her conduct since her 2017 release.

Again, we find this argument unpersuasive, as the record contains sufficient proof to find by clear and convincing evidence that Mother abandoned Child. As the family court noted in its findings of fact and conclusions of law, "abandonment is demonstrated by facts or circumstances that evidence a settled purpose to forgo all parental duties and relinquish all parental claims to the child."[40] Furthermore, while "[i]ncarceration alone can never be construed as abandonment as a matter of law[,] . . . absence, voluntary or court-imposed, may be a factor to consider in determining whether the children have been neglected."[41]

At the hearing, Mother admitted to being incarcerated for five of the first eight years of Child's life and that she has had no contact with Child since November 2014. The family court heard testimony that Mother canceled or failed to attend the vast majority of visitations, seeing Child only sporadically from February 2013 to November of 2014. Although Mother testified that she requested to have contact on multiple occasions after November 2014, J.E.B.

---

[40] *O.S. v. C.F.*, 655 S.W.2d 32, 34 (Ky. App. 1983).

[41] *J.H. v. Commonwealth, Cabinet for Human Res.*, 704 S.W.2d 661, 663–64 (Ky. App. 1985).

testified that she did so only on holidays and birthdays, and she provided little notice of the proposed visitations.

While incarceration alone is insufficient to support a finding of abandonment, the family court ultimately heard a significant amount of evidence to support its finding that Mother intended to forgo her parental duties and relinquish her parental claims to Child even during periods when she was not incarcerated. This evidence and the record as a whole clearly and convincingly support the family court's findings that Mother abandoned child for a period of not less than 90 days. Accordingly, the family court did not err in granting Appellees' petition for adoption and termination of Mother's parental rights to Child under KRS 199.502(1)(a).

## IV. CONCLUSION

For these reasons, the Court of Appeals' decision upholding the family court's judgment is affirmed.

All sitting. Hughes, Keller, Nickell, and VanMeter, JJ., concur. Lambert, J., dissents by separate opinion, in which Conley, J., joins.

LAMBERT, J., DISSENTING: Respectfully, I must dissent. This Court has recognized that substance use disorder (SUD) is a disease. We say that we support those who suffer from the crippling effect of the disease in their recovery. And, we say that we support reunification of parent and child. Yet, a mother who is nearly five years into recovery from SUD and now lives a stable life has been stripped of her parental rights, even though: 1) the Cabinet for Health and Family Services did not seek to terminate those rights; 2) a mental

20

health professional testified that termination would be against her child's best interests; and 3) the child's attorney opposed the termination of her parental rights.

The underlying facts of this case are not that uncommon. A relative of a formerly drug-addicted parent has been granted permanent custody of that parent's child. That parent has now overcome SUD, gotten her life back on track, and sought visitation with her child through an order of the court. This motivated the custodians to sever all ties by the filing of this action. Though M.S.S. certainly has not been a model mother, she has worked diligently in recent years to get her life back on track.

The law of this case, however, reveals a deep constitutional defect in the way our Courts have now interpreted the power of an individual to undermine the parental rights of any parent. We are presented with a straight-forward issue that has a nuanced and complex answer: must an involuntary termination of parental rights (TPR), which can only be brought by the Commonwealth, precede an order for adoption when a natural parent contests that adoption, or may a TPR and an adoption occur simultaneously with limited involvement from the Commonwealth and without the consent of the biological parent? The majority endorses and adopts the latter approach. I disagree. Such an approach empowers private individuals to unilaterally assert the unfitness of natural parents and does not comport with the Kentucky Constitution or the United States Constitution. The majority's opinion muddies further the already turbulent procedural waters that plague this area

21

of family law. Additionally, I believe the trial court's findings of fact were clearly erroneous. I, therefore, dissent.

"The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious than property rights."[42] The state's power to authorize or initiate the severance of the legal relationship and the accompanying bond between natural parent and child ought to be—and has long been—scrutinized with the utmost precision and care.[43] Issues concerning the termination of a biological parent's right to rear and raise their child are of the highest constitutional concern.[44]

In the instant case, private individuals have sought to employ the levers of government to sever a parent/child relationship by way of simultaneous

---

[42] *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (internal quotation marks, brackets, ellipsis, and citations omitted).

[43] *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (stating the Court traditionally recognizes that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment."); *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965) (stating due process requires notice and a hearing in a TPR action, because "the result of the judicial proceeding [would be] . . . permanently to deprive a legitimate parent of all that parenthood implies."); *Stanley*, 405 U.S. at 651 ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.'" (citation omitted)); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition.").

[44] *Cab. for Health and Family Servs. v. K.H.*, 423 S.W.3d 204, 208 (Ky. 2014). *See also Yoder*, 406 U.S. at 213–14 (protecting a parent's right to control the rearing, education, and religion of his or her child); *Skinner v. Oklahoma,* 316 U.S. 535, 541 (1942) (holding that the right to raise a child is a "basic civil right" of a parent).

22

petitions for adoption and TPR. Appellate courts in Kentucky have consistently warned against such joint petitions.[45]

Regardless of who initiated the proceedings to sever the tie that binds the legal and personal relationship between parent and child, the result is the same: the complete and total evisceration of that relationship most sacred.[46] TPR actions, in all their forms, are "the family law equivalent of the death penalty in a criminal case."[47] It does not, to me, reason that procedural protections would, on one hand, be heightened when the Commonwealth brings the proceeding, and, on the other hand, be lessened when a private individual brings the proceeding, because it is ultimately the action of the state—by statute permitting adoption absent a parent's consent and by court order—that effectuates the termination of the parent/child relationship. The General Assembly created the procedure to terminate the right of a parent by way of adoption, and a trial court hearing the proceeding carries out the execution of that right. With such great power must come great scrutiny. This Court, as arbiter between the awesome power of the state to eviscerate the parent and child bond and the inherent right of parent to that bond, must

---

[45] *See, e.g.*, *Wright v. Howard*, 711 S.W.2d 492, 496 (Ky. App. 1986) (calling dual petitions for adoption and TRP a "mistaken procedural approach.").

[46] *Wright*, 711 S.W.2d at 496 (holding that "the adoption itself terminates the non-consenting parent's parental rights."); *Moore v. Asente*, 110 S.W.3d 336, 351 (Ky. 2003) (recognizing that similar to "the final order in a TPR proceeding, a valid adoption judgment terminates the parental rights of the birth parent."); KRS 199.520(2) ("Upon granting an adoption, all legal relationship between the adopted child and the biological parents shall be terminated except the relationship of a biological parent who is the spouse of an adoptive parent.").

[47] *In re Smith*, 77 Ohio App.3d 1, 16 (1991).

23

correct the Commonwealth when its actions are constitutionally deficient. A correction is required here, as this case makes apparent.

To be perfectly clear, the matter under this Court's consideration is not about whether a parent's rights must be terminated prior to a consensual adoption. Nor is our review about who among the biological parent and prospective adoptive parents is better suited to raise, provide for, and love K.K.F.S. It is also beyond dispute that both the prospective adoptive parents and M.S.S. love this child.

Instead, two key questions must be resolved by the issue presented in this case. First, what level of protection is afforded to non-consenting biological parents whose rights would be terminated by an adoption sought pursuant to the applicable statute? Second, are those protections constitutionally sufficient?

The General Assembly does not have the authority to create by statute the right of a private individual to extinguish the most sensitive and deeply rooted relationship in the human experience over the forceful and continued protestation of the party against whom that right would be taken without the due process owed to them.

I would, therefore, hold that it is constitutionally impermissible for a court to terminate a parent's rights over her protestation, without meaningful involvement of the Cabinet, [48] and without there first being an independent

---

[48] The Court of Appeals accurately described the Cabinet's role in an adoption proceeding in *A.F. v. L.B.*, 572 S.W.3d 64, 71 (Ky. App. 2019) (stating "The Cabinet has a role in adoptions. In accordance with KRS 199.510, the Cabinet must investigate

hearing to terminate her parental rights. This is, in part, because the purpose of cabinet involvement is to verify that the adoptive parents are suitable, and the Cabinet's investigation is mainly focused on the prospective adoptive parents—not on the natural parents. The report filed by the Cabinet in this case makes that abundantly clear, as it contains only cursory information about M.S.S. and a statement that M.S.S. did not provide a statement because doing so may appear as if she were in agreement with the adoption.

### a. Standard of Review.

The record reflects that, though filed as a dual petition for adoption and TPR, this case was litigated under Kentucky Revised Statutes (KRS) 199.502. Therefore, this action is an involuntary adoption proceeding in which the adoptive parents have been granted an adoption pursuant to KRS 199.502(1)(a).

While normally appellate review of an involuntary termination or nonconsensual adoption proceeding "is confined to the clearly erroneous standard in Kentucky Rule of Civil Procedure (CR) 52.01 based upon clear and convincing evidence, and the findings of the trial court will not be disturbed

---

and file a confidential report with the family court before a hearing can take place. KRS 199.515 ("After . . . the report required by KRS 199.510 ha[s] been filed, the court . . . may set a time for a hearing on the petition to be conducted in chambers in privacy.'; *Baker v. Webb*, 127 S.W.3d 622, 626 (Ky. 2004) ('KRS 199.515 allows the court to conduct an independent hearing after the Cabinet has filed its investigation report). KRS 199.510(2) requires that '[t]he report of the cabinet . . . shall be filed with the court as soon as practicable but not later than . . . ninety (90) days after the filing date of the petition . . . .' Its statutory purpose is to give some assurance to the court of the veracity of the prospective adoptive parents' allegations, that they are financially able and morally fit to adopt the child, that adoption is in the best interest of the child, and that the child is suitable for adoption. KRS 199.510(1).'").

25

unless there exists no substantial evidence in the record to support its findings,"[49] "[b]ecause this case concerns a matter of constitutional construction or interpretation, we review it de novo."[50] Further, when

> interpreting a statute, we have a duty to accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion. As such, we must look first to the plain language of a statute and, if the language is clear, our inquiry ends. We hold fast to the rule of construction that the plain meaning of the statutory language is presumed to be what the legislature intended, and if the meaning is plain, then the court cannot base its interpretation on any other method or source. In other words, we assume that the Legislature meant exactly what it said, and said exactly what it meant. Our rules of statutory construction, however, do not constrain us from commenting upon plainly-written statutes when oddities within them are exposed by the litigation before us.[51]

### b. KRS 199.502, not KRS 625.050, controls.

"The law of adoption is in derogation of the common law. Nothing can be assumed, presumed, or inferred and what is not found in the statute is a matter for the legislature to supply and not the courts."[52] "The right of adoption being purely of legislative origin, the courts will not, under our three-division system of government, disturb the legislative arrangement, unless a

---

[49] *V.S. v. Commonwealth, Cab. for Human Res.*, 706 S.W.2d 420, 424 (Ky. App. 1986).

[50] *Pinto v. Robison*, 607 S.W.3d 669, 672 (Ky. 2020) (citing *Greene v. Commonwealth*, 349 S.W.3d 892, 898 (Ky. 2011)).

[51] *Commonwealth v. Moore*, 545 S.W.3d 848, 851 (Ky. 2018) (citation omitted).

[52] *Day v. Day*, 937 S.W.2d 717, 719 (Ky. 1997) (citing *Coonradt v. Sailors*, 209 S.W.2d 859 (Tenn. 1948)).

constitutional right is violated or it is repugnant to public policy."[53] "We begin, as we always do, with the text of the statute."[54]

Under the current statutory scheme, the Commonwealth has established two methods by which a natural parent's rights may be terminated without their consent.

The first method is contained in KRS 625.050. As this Court recently opined,

> [t]he right of every parent to raise his or her own child is a fundamental right of utmost constitutional concern. While the Commonwealth of Kentucky may deprive a parent of this right when the circumstances require, KRS 625.090 ensures this right is protected by measures of due process. Namely, the statute establishes three substantive elements necessary for TPR, all of which the Commonwealth must prove by clear and convincing evidence, (a) starting with a finding of abuse or neglect by the parents, (b) then determining that TPR is in the child's best interest, and finally (c) that any one of the grounds for termination listed in KRS 625.090(2)(a)–(j) exists.[55]

Standing to bring suit pursuant to this statute is limited to "the cabinet, any child-placing agency licensed by the cabinet, any county or Commonwealth's attorney or parent."[56]

The second method is contained in KRS 199.500, *et. seq.*, which permits adoption without the consent of the natural parent only in limited

---

[53] *Roark v. Yarbrough*, 411 S.W.2d 916, 918 (Ky. 1966).

[54] *Cab. for Health & Family Servs. v. K.S.,* 610 S.W.3d 205, 210 (Ky. 2020).

[55] *R. M. v. Cab. for Health & Fam. Servs.,* 620 S.W.3d 32, 38 (Ky. 2021) (internal citations and quotation marks omitted).

[56] KRS 625.050(3).

27

circumstances. KRS 199.500 mandates that parental consent is essential in an adoption action, unless certain conditions are met, and states in pertinent part:

> (1) An adoption ***shall not*** be granted without the voluntary and informed consent [ . . . ] ***except*** that the consent of the living parent or parents shall not be required if:
>
> (a) The parent or parents have been adjudged mentally disabled and the judgment shall have been in effect for not less than one (1) year prior to the filing of the petition for adoption;
>
> (b) The parental rights of the parents have been terminated under KRS Chapter 625;
>
> (c) The living parents are divorced and the parental rights of one (1) parent have been terminated under KRS Chapter 625 and consent has been given by the parent having custody and control of the child; or
>
> (d) The biological parent has not established parental rights as required by KRS 625.065.[57]

KRS 199.502(1)(a)-(j) further expounds upon the consent exception created by KRS 199.500(1), and states in pertinent part that: "an adoption may be granted without the consent of the biological living parents of a child if it is pleaded and proved as part of the adoption proceeding that" certain conditions are met. For completeness, KRS 199.502(1)(a)-(j) states in full:

> (1) Notwithstanding the provisions of KRS 199.500(1), an adoption may be granted without the consent of the biological living parents of a child if it is pleaded and proved as part of the adoption proceeding that any of the following conditions exist with respect to the child:

---

[57] Emphasis added.

(a) That the parent has abandoned the child for a period of not less than ninety (90) days;

(b) That the parent had inflicted or allowed to be inflicted upon the child, by other than accidental means, serious physical injury;

(c) That the parent has continuously or repeatedly inflicted or allowed to be inflicted upon the child, by other than accidental means, physical injury or emotional harm;

(d) That the parent has been convicted of a felony that involved the infliction of serious physical injury to a child named in the present adoption proceeding;

(e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child, and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child;

(f) That the parent has caused or allowed the child to be sexually abused or exploited;

(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child;

(h) That:
  1. The parent's parental rights to another child have been involuntarily terminated;
  2. The child named in the present adoption proceeding was born subsequent to or during the pendency of the previous termination; and
  3. The condition or factor which was the basis for the previous termination finding has not been corrected;

29

(i) That the parent has been convicted in a criminal proceeding of having caused or contributed to the death of another child as a result of physical or sexual abuse or neglect; or

(j) That the parent is a putative father, as defined in KRS 199.503, who fails to register as the minor's putative father with the putative father registry established under KRS 199.503 or the court finds, after proper service of notice and hearing, that:

1. The putative father is not the father of the minor;
2. The putative father has willfully abandoned or willfully failed to care for and support the minor; or
3. The putative father has willfully abandoned the mother of the minor during her pregnancy and up to the time of her surrender of the minor, or the minor's placement in the home of the petitioner, whichever occurs first.

These conditions are—word for word—the same grounds for involuntary TPR found in KRS 625.090(2)(a)-(j).[58]

Thus, KRS 199.500(4) and KRS 199.502(1) allow an involuntary adoption if the grounds for involuntary termination of parental rights are met, and both statutes by either direct reference or by exact language contemplate that there is some relationship between the adoption statute and KRS Chapter 625. However, the protections afforded to non-consenting parents under KRS 199.502 are significantly lower than those afforded to parents whose rights are sought to be terminated pursuant to KRS Chapter 625.

KRS 625.090 provides for a tripartite test which allows for parental rights to be involuntarily terminated only upon a finding, based on clear and convincing

---

[58] KRS 625.090(2) differs only to the extent that it contains an eleventh condition.

evidence, that the following three prongs are satisfied: (1) the child is found or has been adjudged to be an abused or neglected child as defined in KRS 600.020(1); (2) termination of the parent's rights is in the child's best interests; and (3) at least one of the termination grounds enumerated in KRS 625.090(2)(a)-(j) exists.[59]

There is no such tri-partite test for an involuntary adoption—the only question that was and has been addressed in the instant case was whether the mother abandoned her child for ninety days in 2014—approximately five years before the TPR via adoption.

The statute that governs TPR "in all of its forms" is a general statute, and the statute that governs non-consensual adoption—a discreet subset of TPR—is a specific statute.[60]

Thus, since a petition seeking adoption of a child against the child's biological parent's wishes is a discrete subset of involuntary termination of parental rights cases, then the statute allowing appeals from adoption proceedings (KRS 199.560) is controlling because it is more narrowly focused than is the general statute forbidding appeals of orders denying involuntary termination of parental rights petitions (KRS 625.110).[61]

However, absent from the conditions enumerated by KRS 199.502 is the requirement that a proceeding to terminate parental rights take place and conclude before a petition of adoption is granted. That condition is present in KRS 199.500. Therefore, were the case to precede under KRS 199.500(1)

---

[59] *K.H.*, 423 S.W.3d at 209.

[60] *C.M.C. v. A.L.W.*, 180 S.W.3d 485, 489 (Ky. App. 2005).

[61] *Id.* at 490 (citing *DeStock No. 14, Inc. v. Logsdon*, 993 S.W.2d 952, 959 (Ky.1999); 73 Am. Jur. 2d Statutes § 170 (2001)).

rather than KRS 199.502, then the procedural protections of KRS Chapter 625 would be in full force.  The result is a constitutional end-run created by a statutory loophole.

Contrary to the majority's contention that we have failed to identify how there is any meaningful procedural difference between the two actions, this case creates a precedent that any person who has custody of a child can prevent that child's natural parent from seeing the child for ninety days and then seek to sever the legal and emotional tie between parent and child without a showing of unfitness beyond parental absence for a ninety-day period and without any meaningful input from the Cabinet.  Whereas, if the case were to proceed as a TPR, only the designated state actor may seek to terminate parental rights.  Then there must be a determination as to the parent's unfitness to care for the child before that parent's rights to the child are extinguished.  The majority's opinion today crafts the path for avoiding the careful work of the state in investigating and verifying when or if a parent is unfit.  This path runs roughshod over the individual liberty rights of biological parents.

### c. KRS 199.502 impermissibly denies natural parents due process under the Kentucky Constitution.

A statute carries a strong presumption that it is constitutional.[62]  When faced with a challenge to the constitutionality of a statute, it is the appellate court's responsibility to "draw all reasonable inferences and implications from

---

[62] *Wynn v. Ibold, Inc.*, 969 S.W.2d 695 (Ky. 1998).

the act as a whole and thereby if possible sustain the validity of the act."[63]  Of

course, statutes must be constitutionally sufficient to withstand the review of

this Court.[64]

While the U.S. Constitution and federal courts' interpretation of the U.S.

Constitution are useful guideposts in my analysis, my dissent is based on the

additional rights that flow from the Kentucky Constitution.  The United States

Constitution recognizes the minimum protections afforded to individual rights.

Our Constitution supplies protection above and beyond that federal floor.[65]

Nevertheless, guidance from the U.S. Supreme Court proves useful to our

review of this issue.

Several principles emerge from the federal framework.  A natural parent's

right is a fundamental liberty interest, and shall not be disturbed by the state

"absent a powerful countervailing interest[.]"[66]  When fundamental liberty

interests are implicated, the due process clause of the Fourteenth Amendment

---

[63] *Graham v. Mills,* 694 S.W.2d 698, 701 (Ky. 1985).

[64] *Rose v. Council for Better Educ., Inc.,* 790 S.W.2d 186, 209 (Ky. 1989).

[65] *See, e.g., Commonwealth v. Wasson,* 842 S.W.2d 487, 492 (Ky. 1992), *overruled on equal protection grounds by Calloway Cnty. Sheriff's Dep't v. Woodall,* 607 S.W.3d 557 (Ky. 2020) (stating "under our system of dual sovereignty, it is our responsibility to interpret and apply our state constitution independently.  We are not bound by decisions of the United States Supreme Court when deciding whether a state statute impermissibly infringes upon individual rights guaranteed in the State Constitution so long as state constitutional protection does not fall below the federal floor, meaning the minimum guarantee of individual rights under the United States Constitution as interpreted by the United States Supreme Court." (internal citations omitted)).

[66] *Stanley,* 405 U.S. at 651.

"guarantees more than fair process."[67]  The due process clause also has a

substantive aspect, which protects "individual liberty against certain

government actions regardless of the fairness of procedures used to implement

them."[68]  Therefore, "the Due Process Clause of the Fourteenth Amendment

protects the fundamental right of parents to make decisions concerning the

care, custody, and control of their children."[69]  And, "[t]he fundamental liberty

interest of natural parents in the care, custody, and management of their child

does not evaporate simply because they have not been model parents or have

lost temporary custody of their child to the State."[70]

While the U.S. Supreme Court has not articulated a clear standard of

review in the context of parental rights cases, when fundamental rights such as

these are implicated strict scrutiny is the generally employed standard.[71]

However, the great weight of the protections of the due process clause are only

---

[67] *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997) (holding that the due process clause of the Fourteenth Amendment contains a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests").

[68] *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (internal quotation marks and citation omitted).

[69] *Troxel v. Granville*, 530 U.S. 57, 66 (2000).

[70] *Santosky*, 455 U.S. at 753–54.

[71] *Troxel*, 530 U.S. at 80 (Thomas, J., concurring) (stating "[t]he opinions of the plurality, Justice Kennedy, and Justice Souter recognize such a right, but curiously none of them articulates the appropriate standard of review. I would apply strict scrutiny to infringements of fundamental rights."); *Reno v. Flores*, 507 U.S. 292, 301–302 (1993) (reaffirming that due process "forbids the government to infringe certain fundamental liberty interests [. . .] unless the infringement is narrowly tailored to serve a compelling state interest"); *Cf. Troxel*, 530 U.S. at 69 (holding only that judges must give some, undefined "special weight" to the views of fit parents before overriding their judgment).

in full effect when a parent has developed the relationship between parent and child and where a parent has not been deemed unfit.[72]  In the context of termination proceedings, before a state may impair a natural parent's right to the custody, care, and control of this child, there must be an independent adjudication of unfitness.[73]

With these overarching principles in mind, I now turn to the protections afforded by our state constitution.

The Kentucky Constitution provides that all Kentuckians "are, by nature, free and equal, and have certain inherent and inalienable rights," including "the right of enjoying and defending their lives and liberties."[74]  Section 2 of the Kentucky Constitution further guarantees individual liberty by forbidding the Commonwealth from exercising "absolute and arbitrary power over the lives, liberty and property" of its citizens.  This Court has recognized that the right to parent is jealously guarded by the Kentucky Constitution.[75]  While the current statutory scheme for TPR offers adequate constitutional protections, the lack of the same level of protection offered in non-consensual adoption is constitutionally untenable.

---

[72] *Lehr v. Robertson*, 463 U.S. 248, 260-61 (1983).

[73] *Stanley*, 405 U.S. at 657–58 (holding "[t]he State's interest in caring for Stanley's children is de minimis if Stanley is shown to be a fit father.  It insists on presuming rather than proving Stanley's unfitness solely because it is more convenient to presume than to prove.  Under the Due Process Clause that advantage is insufficient to justify refusing a father a hearing when the issue at stake is the dismemberment of his family.").

[74] KY Const. § 1.

[75] *See, e.g., K.S.*, 610 S.W.3d at 211.

35

As this Court recently stated, "the fact that the General Assembly decided to supply litigants with more process than is constitutionally required in one context does not" preclude this Court's review of the protections offered in another.[76]  The duty of this Court to do so is deeply rooted in our history:

> The judiciary has the ultimate power, and the duty, to apply, interpret, define, [and] construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it.  It is solely the function of the judiciary to so do.  This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.[77]

While I am mindful of the fact that "[a]s the judicial branch, we are not at liberty to write into a statute that which does not exist,"[78] we are empowered to recognize and call out statutory gaps and their constitutional deficits.

This Court has had rare occasion to address the interrelationship between these two statutes and of resulting inequitable dichotomy, and has never considered the constitutionality of the statute.

In *Smith v. Wilson,* our predecessor Court was faced with the same type of dual TPR/adoption petition now before this Court.[79]  Adoptive parents sought to terminate the rights of a child's mother without her consent, and the Jefferson Circuit Court ordered termination pursuant to KRS 199.600(1)—the

---

[76] *Id.* at 213.

[77] *Rose*, 790 S.W.2d at 209.

[78] *Blackaby v. Barnes*, 614 S.W.3d 897, 903 (Ky. 2021).

[79] 269 S.W.2d 255 (Ky. App. 1954).

predecessor statute to KRS Chapter 625—and adoption pursuant to KRS

199.500.[80]  The Court held that the adoptive parents lacked standing to pursue

the action to terminate the parental rights without the consent of the mother.[81]

The *Smith* Court further held that the adoption, which had the same result as a

TPR action, was permissible.[82]  The Court stated:

> The case was primarily and purposefully instituted to
> adopt the child, KRS 199.470, although it was coupled
> with a proceeding for the involuntary termination of
> parental rights.  KRS 199.600.  As we have held above,
> this latter proceeding could not be maintained by the
> private individuals.  But the judgment of adoption in
> this particular case substantially accomplishes the
> same end, for KRS 199.530 declares, inter alia, that an
> adopted child 'shall be considered, for purposes of
> inheritance and succession and for all other legal
> considerations, the natural, legitimate child of the
> parents adopting it' and the child is freed from all legal
> obligations of maintenance and obedience to its natural
> parents.  KRS 199.530(2).[83]

Justice Stewart's dissent makes clear the absurdity of such a result.  He stated

in full:

> KRS 199.600(5) specifies the persons who may
> institute an action to terminate parental rights under
> KRS 199.600(1), and the majority opinion correctly

---

[80] *Id.* at 256.

[81] *Id.* at 257 (stating "[w]hen the extreme character of the present action is considered—interference with or severance of the natural rights of a parent and making the child the ward of the State—we think that in providing that the action 'may be instituted' the legislative intent was to vest exclusive discretionary power in the designated public officers.  This is a matter of public and not private concern. Therefore, we are of [the] opinion the court should have sustained the plea of absence of authority in the plaintiffs to maintain this part of the two-fold action.").

[82] *Id.* at 258 (stating "[t]he welfare of a child such as this is the manifest objective of the statute under which the proceeding has been maintained.  That objective is attained by the judgment of adoption.").

[83] *Id.*

holds that plaintiffs are excluded from those named in the first-mentioned subsection and therefore could not maintain the action in this respect. The inevitable result is that the parental rights of the mother, defendant below, were not and have not been severed as to the child. However, the opinion proceeds to hold that plaintiffs may nevertheless adopt the child and this can only mean that the adoption is approved by this Court with the natural parent still retaining all of the rights of parenthood in and to the child. Such a result is repugnant to the plain requirements of KRS 199.600, which control the procedure in this case, and, more than that, the letter and spirit of the statutory provisions controlling adoptions under the Division of Child Welfare of the Kentucky Children's Bureau have been summarily brushed aside.[84]

In *Roark v. Yarbrough*, our predecessor Court—again faced by dual petition for adoption and TPR—acknowledged the statutory loophole, and stated as follows:

the plaintiffs are not entitled to the relief sought of terminating the parental rights as such because they do not belong to that class of persons set out in KRS 199.600(1), but that they are entitled to adopt the children as they have alleged and proven pursuant to KRS 199.500(4) that certain facts set out in KRS 199.600(1) exist with respect to the said children. Thus, it is apparent counsel for the grandparents and the judgment of the circuit court have threaded the needle of our adoption laws. The right of adoption being purely of legislative origin, the courts will not, under our three-division system of government, disturb the legislative arrangement, ***unless a constitutional right is violated*** or it is repugnant to public policy. Adoption may be harsh and drastic in some instances where a parent is deprived of his child in violation of his sacred and enduring natural rights, but the legislature has recognized the supremacy of guardianship of the State over that of the parent.[85]

---

[84] *Id.* at 258-59 (internal citations omitted).

[85] 411 S.W.2d at 918 (emphasis added).

Of course, at the time *Roark* was under consideration, the contours of federal

due process rights had just begun to take shape.

Decisions from the Court of Appeals concerning dual petitions for TPR

and adoption likewise have not contemplated the constitutional nature of these

cases. In *O.S. v. C.F.*, the Court acknowledged the applicability of the *Santosky*

standard of proof, and held:

> Parental rights are so fundamentally esteemed under
> our system that they are accorded due process
> protection under the 14th Amendment to the United
> States Constitution, when sought to be severed at the
> instance of the state. Under *Santosky*, the 14th
> Amendment prescribes the standard controlling the
> judgment of the "fact-finders" in severing the rights.
> That standard is one of "clear and convincing
> evidence." It is this standard which *Santosky* imposes
> upon the states. States may have a more rigid or
> higher standard but they may not have a less stringent
> test. In *Santosky*, the U.S. Supreme Court set the
> minimum.[86]

However, the Court stopped short of articulating what protections are afforded

to parents who are contesting an adoption.

In *Wright v. Howard*, the Court of Appeals was once again faced with a

dual petition for TPR and adoption.[87] The Court determined that when such

dual petitions are filed, they were to be treated only as a petition for adoption,

since adoption terminated the rights of the natural parents as recognized in

---

[86] 655 S.W.2d 32, 33 (Ky. App. 1983).

[87] *Wright*, 711 S.W.2d at 495.

*Jouett v. Rhorer.*[88]  However, the constitutional aspect of the effect of the termination was not raised and was not considered.

In an unpublished opinion, the Court of Appeals broached the constitutional question now squarely before this Court.  In *K.N. v. R.P.,* the Court of Appeals recognized that constitutional safeguards must be implemented.  The court stated in relevant part:

> Although the State did not initiate the proceedings at issue, the nature of the parents' and children's fundamental rights remain unaltered.  The same procedural safeguards mandated in *Santosky* apply regardless of whether one is threatened with the loss of his or her parental rights pursuant to . . . the involuntary termination statute, or by adoption of his or her child without the parent's consent.  The result to the natural parent is the same in either proceeding, that is, total deprivation of any legal or personal connection with the child.  Moreover, because judicial action was required for the termination of parental rights, it is evident that the State did have involvement in severing these rights.
>
> Kentucky Revised Statute 199.502 does not require that a proceeding to terminate parental rights take place before a petition of adoption is granted.  Rather, and as the language of the statute specifically states, an adoption may be granted without the consent of the biological parents of a child if it is pleaded and proved as part of the adoption proceedings that any of a number of conditions exists.  Termination of parental rights to the child or children sought to be adopted is not one of the enumerated conditions.  Certainly, an adoption without the consent of living biological parents effectively terminates the biological parents' rights; therefore, constitutional safeguards must be implemented.[89]

---

[88] *Id.* (citing *Jouett v. Rhorer*, 339 S.W.2d 865, 868 (Ky. 1960)).

[89] No. 2007-CA-000181-MR, 2008 WL 275106, at *10 (Ky. App. Feb. 1, 2008) (internal citations, quotation marks, and brackets omitted).

Cases concerning the parent/child relationship strike at the core of our society. The statutory backdoor that has empowered private individuals to usurp the right of a natural parent is repugnant to the due process afforded by the state constitution. I would hold that the substantive due process guaranteed by the Kentucky Constitution requires a separate hearing on the termination of parental rights before a court can enter an order effectuating a non-consensual adoption. This is a logical extension of the United States Supreme Court's holding in *Stanley v. Illinois*,[90] which required at least a hearing to determine unfitness before a state could place a child in foster care over a unwed parent's protestation, and is rooted in the paramount nature of the relationships at issue in the case at bar. Of course, the only parties with standing, pursuant to KRS 625.050(3), to petition for such a hearing are "the cabinet, any child-placing agency licensed by the cabinet, any county or Commonwealth's attorney or parent." Therefore, before a prospective adoptive parent can proceed with an involuntary adoption, a court of competent jurisdiction must first terminate the rights of the natural parents.

### d. The trial court's determination was clearly erroneous.

Notwithstanding and beyond the constitutional issues raised by this case, I also disagree with the majority and the majority in the Court of Appeals in their assessment of the trial court's findings of fact. As the majority

---

[90] *Stanley,* 405 U.S. at 651.

correctly notes, "a termination of parental rights will be reversed only if it was clearly erroneous and not based upon clear and convincing evidence."[91] "Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people."[92]

The sole ground for terminating M.S.S.'s parental rights and granting the adoption was based upon KRS 199.502(1)(a), which requires the court to find by clear and convincing evidence that "the parent has abandoned the child for a period of not less than ninety (90) days." The trial court found that, because M.S.S. did not contact the child in 2014-2015, during which time she was not incarcerated, and because she had instead been "involved in substance use and abuse that led her into a wretched lifestyle that did not include this child or help her to be a capable and effective parent for this child," she had abandoned the child. Essentially, the trial court told M.S.S. that the vast improvements she had made for her life in the previous five years—including her recovery from SUD and the efforts she had undertaken to reestablish her relationship with her child—were "too little too late."

Abandonment is not defined by either KRS Chapter 199 or KRS Chapter 625. This Court has defined abandonment "as 'neglect and refusal to perform

---

[91] *M.A.C. v. E.A.*, No. 2020-CA-0087-ME, 2021 WL 2878347, at *2 (Ky. App. July 9, 2021) (citing *Commonwealth, Cab. for Health and Family Servs. v. T.N.H.*, 302 S.W.3d 658, 663 (Ky. 2010); CR 52.01).

[92] *M.P.S. v. Cab. for Human Res.*, 979 S.W.2d 114, 117 (Ky. App. 1998) (citing *Rowland v. Holt*, 70 S.W.2d 5, 9 (1934)).

natural and legal obligations to care and support, withholding of parental care, presence, opportunity to display voluntary affection and neglect to lend support and maintenance . . . it means also the failure to fulfill responsibility of care, training, and guidance during the child's formative years.'"[93]  A finding of abandonment must be supported by clear and convincing evidence that shows a willful intent "to forego all parental duties and relinquish all parental claims to the child."[94]  When a parent has been incarcerated, that incarceration should not be considered a factor in the court's abandonment analysis, but instead should be considered when making a determination as to the best interests of the child.[95]

As the record reflects, there is no doubt that M.S.S. has struggled with "substance abuse," as the trial court labeled it, or SUD as it is now known. She was incarcerated as an eighteen-year-old related to issues stemming from SUD.  She was very candid about her struggle with substance use before the trial court and in her interviews with the guardian *ad litem* (GAL).  There is also no doubt that, because of her addiction, she has been incarcerated for much of the early years of the child's life.  She would send the child letters while

---

[93] *Simms v. Est. of Blake*, 615 S.W.3d 14, 24 (Ky. 2021) (quoting *Kimbler v. Arms*, 102 S.W.3d 517 (Ky. App. 2003)).

[94] *O.S.,* 655 S.W.2d at 34 (citing 2 Am. Jur.2d Adoption § 32 (1962)).

[95] *Cab. for Human Res. v. Rogeski,* 909 S.W.2d 660, 661 (Ky. 1995) (holding "[a]lthough incarceration for an isolated criminal offense may not constitute abandonment justifying termination of parental rights, incarceration is a factor to be considered, particularly so in a case such as this because KRS 625.090(2)(b) specifies that 'acts of abuse or neglect toward any child in the family' is a factor that circuit courts shall consider in determining the best interest of the child who is the subject of the termination action.").

incarcerated, but the prospective adoptive parents threw them away without opening them and prevented the child from knowing of them.

In 2015, M.S.S. was convicted of promoting contraband and served two and a half years. She testified that she has been sober since 2015, which she credits to moving away from her family, who also have a long history of addiction. She was released in August of 2017. Prior to her most recent incarceration, her visitation with the child was sporadic at best. Following her release in August 2017, M.S.S. has worked diligently to re-establish her life. She has maintained the same job, began and maintained therapy, has maintained a stable relationship with her significant other, and has attempted to contact her child. Those attempts were thwarted by the prospective adoptive parents. I can only assume from the record that as a result of those thwarted attempts, M.S.S. resorted to filing an action to establish visitation in February of 2018.[96]

The GAL submitted a thorough post-hearing report to the trial court recommending against "the termination of parental rights" as to M.S.S. She reported that M.S.S. has actively sought to be in her child's life. And, the GAL reported that Dr. Bruce Fane, a psychologist who evaluated both M.S.S. and the child, stated that the mother could be reintroduced to the child, and that it would be beneficial to the child to have a relationship with her mother.

---

[96] Civil Action No. 18-CI-173.

I would hold that KRS 199.502 is unconstitutional to the extent that it permits private individuals to seek to involuntarily terminate the rights of parents, and, secondarily that the trial court erred in finding that M.S.S. abandoned the child. Doing so would not upset the status quo: J.E.B. and D.J.B. have permanent custody of the child through a separate order, the child would remain in their home, and M.S.S. would still be empowered to litigate her right to visitation with her biological child. Therefore, I dissent.

Conley, J., joins.


COUNSEL FOR APPELLANT:

Steven O. Thornton


COUNSEL FOR APPELLEES:

D. Bailey Walton
Walton Law, P.L.L.C.